UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KATHERINE WILLINGHAM-JOHNSON ) | CASE NO.  1:12CV2762 |
| ) | |
| Plaintiff ) | MAGISTRATE JUDGE |
| ) | GEORGE J. LIMBERT |
| v. ) | |
| ) | **MEMORANDUM AND OPINION** |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION ) | |
| ) | |
| ) | |
| Defendant. ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Katherine Willingham-Johnson Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).  The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his February 2, 2012 decision in finding that Plaintiff was not disabled because she could perform her past relevant work as a claims processing clerk (Tr. 32).  The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

## I.      PROCEDURAL HISTORY

Plaintiff filed for disability insurance benefits and supplemental security income benefits on February 11, 2010, based on allegations that she experienced heart problems, anemia, and degenerative disc disease (Tr. 46, 82, 165, 169, 237).  Plaintiff alleges that her conditions became disabling, rendering her incapable of work, as of January 8, 2010 (Tr. 165).

1

The Commissioner denied Plaintiff's claims initially on August 4, 2010, and, upon reconsideration, on October 25, 2010 (Tr. 78-81). Thereafter, Plaintiff appealed for a hearing before an ALJ, which was held on January 1, 2012 (Tr. 42). At the hearing, Plaintiff, who was represented by legal counsel, and a vocational expert (VE), testified (Tr. 49. 67). On February 2, 2012, the ALJ issued a decision, finding Plaintiff not disabled under the Act (Tr. 24-33). Following the ALJ's ruling, Plaintiff filed a request for review to the Appeals Council, which was denied on September 15, 2012 (Tr. 1-4). Thereafter, Plaintiff sought judicial review pursuant to 42 U.S.C. Sections 405(g) and 1383©.

## II. STATEMENT OF FACTS

Plaintiff was born on January 16, 1949, and was sixty-three years old at the time of the ALJ's decision, a "person closely approaching retirement" under the Social Security Regulations (Tr. 165). 20 C.F.R. Sections 404.1563(e), 416.963(e). She completed high school and three years of college (Tr. 202). For the eight years prior to Plaintiff's alleged disability onset date, Plaintiff worked as a secretary in a nursing home (Tr. 203). Prior to that, from 1999 to 2002, Plaintiff worked as a department store cashier, mail clerk, general office clerk, claims processing clerk, insurance customer service representative, and medical unit secretary (Tr. 67-68, 203).

Plaintiff was laid off from her nursing home job on January 8, 2010, the same date she alleges she became unable to work (Tr. 202). Plaintiff was laid off because her position was terminated. The letter advising Plaintiff of her termination stated that she was being laid off "due to unforeseen economic hardship" (Tr. 192).

2

## III. SUMMARY OF MEDICAL EVIDENCE

### A. Plaintiff's Heart History

In June 2004, Plaintiff underwent cardiac catheterization and balloon angioplasty following reports of chest pain, and she was discharged to home in a stable condition (Tr. 265-66). In March 2008, her doctors recorded that she was not following up with her cardiologist for care, nor was she following up with her gynecologist following problems with post-menopausal bleeding and anemia that required her to be given a blood transfusion (Tr. 383).

On June 3, 2009, Plaintiff treated at Southpointe Hospital, where she claimed to be experiencing chest pain and pressure (Tr. 300). Upon examination, her heart sounds were normal, her EKG was normal, her ejection fraction was sixty-five percent, and a stress test from the previous year was normal (Tr. 311). Plaintiff's physician assessed that her chest pain was atypical for angina with no evidence of acute coronary syndrome, and that her pain may be related to her anemia (Tr. 311). A chest CT scan was negative for a pulmonary embolism, and there was no radiographic evidence for acute cardiopulmonary disease (Tr. 340, 342). Plaintiff was prescribed nitroglycerin paste and other medications to treat her symptoms (Tr. 315). A November 2009 chest x-ray showed no significant interval change from her prior examination in June, and she had no acute pulmonary process (Tr. 332).

On March 5, 2010, Plaintiff reported to physicians at Metrohealth Medical Center (Metro) that she had tightness in her chest, which she noticed when walking approximately fifty yards (Tr. 360). Plaintiff claimed her symptoms had increased since January 2010, she had one episode of left arm numbness, and she was under additional stress due to losing her job (Tr. 360). Metro referred Plaintiff to see her gynecologist for treatment of her anemia, and noted that if her symptoms dissipated, a further cardiac work up would not be necessary (Tr. 363).

On March 5, 2010, Plaintiff contacted a Social Security field office via telephone, and reported that she was looking for a job and applying every day (Tr. 212). Plaintiff reported that she was hopeful that she could return to work, but felt that she could only handle a "sitting job" rather than a "standing job," because she could only stand for one hour at a time (Tr. 212).

On June 3, 2010, Michael Stock, M.D. conducted a physical RFC assessment of Plaintiff based on a review of her medical records (Tr. 455). Dr. Stock found that Plaintiff could occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and had no limitation on her ability to push or pull (Tr. 456). Dr. Stock also found that Plaintiff could occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds (Tr. 457). Dr. Stock also opined that Plaintiff should avoid concentrated exposure to extreme heat and cold (Tr. 459). Dr. Stock's assessment corresponds with a person who can engage in "light work." 20 C.F.R. Sections 404.1567(b), 416.967(b). In his decision, the ALJ noted that he agreed with Dr. Stock's analysis in part, but afforded it little weight because the Doctor did not have Plaintiff's entire medical record available to him, and the ALJ believed that additional evidence warranted a finding that Plaintiff could perform only sedentary work rather than light work (Tr. 32).

On June 15, 2010, Plaintiff was admitted to Southpointe Hospital for complaints of chest pain and numbness (Tr. 467). Plaintiff's ejection fraction was normal, measuring sixty-five percent (Tr. 524). Testing revealed that Plaintiff had normal left ventricular systolic function, and only mildly elevated pulmonary artery systolic pressure (Tr. 524). Testing on June 16, 2010 indicated there was no evidence to suggest she experienced a pulmonary embolism, and she did not have aortic stenosis (Tr. 48). An EKG showed no acute changes to her heart function, and doctors determined there was no need for additional cardiac testing at that time (Tr. 480). Plaintiff's left hand grip appeared mildly

4

weak compared to her right (Tr. 481). Upon discharge, Plaintiff was advised to exercise, lose weight, and follow a low cholesterol diet (Tr. 480).

In July 2010, Plaintiff again visited Southpointe Hospital for treatment of her post-menopausal bleeding (Tr. 287). At that time, an examination showed no angina or shortness of breath, and Plaintiff's heart rate and rhythm were normal (Tr. 498-99). There was no radiographic evidence for acute cardiopulmonary disease, and no pulmonary embolism or other acute findings in the chest revealed by a CT scan (Tr. 501-02).

On August 4, 2010, Dr. Stock, following a further review of Plaintiff's medical records, observed that her cardiac symptoms cleared with improvement of her anemia (Tr. 576). On August 27, 2010, x-rays of Plaintiff's chest taken at Metro were normal and unremarkable (Tr. 614). Although Plaintiff complained of worsening chest pressure, with left-sided pressure radiating down her left arm also, causing left arm numbness, an ECG showed no acute changes, her ejection fraction was normal (sixty-five percent), and her treatment notes indicate that her symptoms were related to her anemia (Tr. 615, 617).

On November 30, 2010, Plaintiff treated with Michael Smith, M.D., at which time her heart rate and rhythm were regular, and she had no heart murmurs, rubs, or gallops (Tr. 770). Plaintiff's physician, Lee Gemma, M.D., opined on December 2, 2010 that at least part of her chest pain appeared to be related to gastrointestinal discomfort (Tr. 703). Dr. Gemma noted that they would only perform further cardiac testing if Plaintiff's symptoms persisted after her anemia was treated and she underwent a planned hysterectomy the following month (Tr. 703). Following Plaintiff's hysterectomy surgery, Plaintiff requested that her doctor, Rochele Beachy, M.D., fill out paperwork attesting that Plaintiff was able to work, with the exception of the time she spent in the hospital for surgery, in order that she could continue to collect unemployment benefits (Tr. 727).

At a January 12, 2011 examination, Plaintiff again had negative cardiovascular symptoms, including no chest pressure, tightness, or palpitations (Tr. 730). Eight months later, in August 2011, testing again revealed Plaintiff had a regular heart rate and rhythm, with no murmurs, gallops, or rubs (Tr. 882, 889). Although her Doctor noted that her symptoms may have been indicative of unstable angina, Plaintiff refused further evaluation (Tr. 883). At that time, Plaintiff reported that her chest pain improved following her hysterectomy (Tr. 880). On September 29, 2011, Dr. Beachy again found that Plaintiff's heart rate and rhythm were regular, and she had no murmurs, clicks, or gallops (Tr. 917). In an October 2011 letter from Aleksander Rovner, M.D. to Dr. Beachy updating her on Plaintiff's condition, Dr. Rovner wrote that Plaintiff reported chest pain the previous day, but that she was currently doing well, with no complaints of pain, chest tightness, or pressure (Tr. 909). Dr. Rovner continued that Plaintiff had no heart failure symptoms, no palpitations, and no fainting (Tr. 909). Upon examination, Plaintiff had no pulmonary issues, and she had a regular heart rate and rhythm, no significant heart murmur, and no back issues (Tr. 910). An EKG showed no acute changes (Tr. 911). Dr. Rovner planned to evaluate further Plaintiff's coronary anatomy, and he recommended that she continue taking her medications and participate in physical therapy (Tr. 911).
physical therapy (Tr. 455).

B.      Plaintiff's Back History

On October 3, 2010, Plaintiff visited the Southpointe Hospital with complaints of chronic lower back pain (Tr. 578). She was prescribed pain medication, and discharged (Tr. 583). Thereafter, Plaintiff underwent testing at Metro (Tr. 626). Plaintiff reported that she had numbness and tingling down her right leg, which caused her to fall the previous week, and she was having trouble climbing the stairs to her apartment (Tr. 635). Plaintiff reported difficulty putting on her shoes, doing laundry, lifting, bending over her sink, and getting in and out of the bathtub (Tr. 636). Upon examination,

Plaintiff's muscle strength was a 5/5 for her L1-2, L3, L4, and S1 vertebrae (Tr. 637). The doctors at Metro noted that Plaintiff's pain symptoms were radicular in nature, and that she would benefit from physical therapy (Tr. 638). In addition, Plaintiff possessed good rehabilitation potential to meet all of her physical therapy goals, her impairments had the ability to improve progressively, and her goals were expected to be achieved in eight physical therapy sessions (Tr. 638-39).

On October 27, 2010, Plaintiff visited Stephen Dechter, M.D. at Metro to address her back pain and related leg pain issues (Tr. 648). Upon examination, Plaintiff had decreased sensation to light touch over her dorsum and the planar surface of her right foot (Tr. 651). Her lumbar lordotic curvature was normal, and she had no evidence of scoliosis (Tr. 651). Plaintiff's range of motion was mildly decreased in all planes, and her palpatory exam revealed tenderness along her right LS junction and along the right S1 joint through the right gluteus maximus (Tr. 651). She had no evidence of spasms or trigger points (Tr. 651). A supine straight leg raise test was positive on the right at forty-five degrees with radicular symptoms, and a seated straight leg test was positive for tripoding (Tr. 651-52). Dr. Dechter diagnosed Plaintiff with radicular lower back pain and neurologic findings suspicious for L5 radiculopathy (Tr. 652). Plaintiff's treatment plan included medication, physical therapy for strengthening, development of a home exercise plan, and using heat and ice (Tr. 652). Dr. Dechter scheduled a follow-up appointment in three months (Tr. 652).

On February 23, 2011, Plaintiff followed up with Dr. Dechter, and her examination results were largely unchanged (Tr. 826). On March 23, 2011, Plaintiff's examination results with Dr. Dechter were again similar, and he reviewed two MRIs taken in the previous month (Tr. 833). A February 27, 2011 MRI showed Plaintiff had a right L4-5 disc extrusion with cudal migration of a free agent, multi-level degenerative stenosis, and a right paramedian disc extrusion at T10-11, with mild associated cord compression (Tr. 833). A March 20, 2011 MRI showed Plaintiff had a disc

extrusion at T10-11, causing moderate to severe narrowing of her spinal cord with mild flattening of the spinal cord, moderate or severe narrowing of her right neural foramen, and at C6-7, Plaintiff had spurring and a diffuse disc bulge, causing mild narrowing of spinal canal (Tr. 833). Based on his exam and review of these MRIs, Dr. Dechter renewed Plaintiff's medications, encouraged her to do physical therapy, and scheduled a follow-up appointment in three months (Tr. 834). On April 12, 2011, although Dr. Dechter offered Plaintiff epidural injections to treat her back pain symptoms, Plaintiff refused the treatment (Tr. 754). As of December 14, 2011, Plaintiff had not received the lumbar epidural that was ordered (Tr. 930).

### IV.    SUMMARY OF TESTIMONY

At the hearing before the ALJ, Plaintiff testified that she has daily chest pain that carries down her left side (Tr. 49). Plaintiff reported she takes nitroglycerin tablets for her chest pains two to three times daily, and her medications sometimes alleviate her pain (Tr. 50). Plaintiff claimed that work activities, including walking and light lifting, aggravate her symptoms (Tr. 50). She also alleged that she experienced back pain from a pinched nerve, which caused pain down both of her legs (Tr. 53). Plaintiff testified that walking, bending, and sitting all caused her pain due to her back condition (Tr. 53). She alleged that when she stands up, she needs to wait approximately five to ten minutes before she can walk due to her pain (Tr. 54). Plaintiff also testified that she can sit for about thirty to sixty minutes at a time (Tr. 54).

Plaintiff further testified that she is left-handed, and she has difficulty using her hand due to numbness (Tr. 52). She testified that her left hand numbness would sometimes affect her ability to type in her previous jobs (Tr. 58). When no experiencing pain, Plaintiff can button clothes and pick up coins with her hands (Tr. 65).

During a typical day, Plaintiff cares for her two-year-old granddaughter and tries to find part-time work (Tr. 56). She has difficulty climbing the stairs to her apartment, but she lives alone and does her own grocery shopping (Tr. 57). After Plaintiff's alleged disability onset date, she went on more than one job interview for secretarial work, but did not receive a job offer (Tr. 61).

Thereafter, the VE testified when asked by the ALJ to define and classify Plaintiff's past relevant work (Tr. 67). The VE testified that, among her other jobs, Plaintiff's past work as a customer service representative was a skilled, sedentary job (Tr. 68). Plaintiff's customer service job also provided her with skills transferable to other sedentary work, including clerical skills, data entry skills, customer relation skills, and record keeping skills (Tr. 68).

The ALJ then posed a hypothetical question to the VE, asking whether a person of Plaintiff's age, education, work experience, and RFC, as set forth above, could perform Plaintiff's past relevant work (Tr. 68-69). The VE testified that such a person could perform the job of customer service representative (Tr. 69).

## V.  STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. These steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. 404.1520© and 416.920(C)(1992);

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of

9

>
> disabled will be made without consideration of vocational factors (20 C.F.R. 404.1520(d) and 416.920(d) (1992);
>
> 4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e) and 416.920(e) (1992);
>
> 5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence,

but less than a preponderance. *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

## **VII.** **ANALYSIS**

Plaintiff asserts two issues on appeal.

A. Whether substantial evidence supports the residual functional capacity as determined by the Administrative Law Judge.

B. Whether the ALJ failed to properly assess Plaintiff's credibility.

Based upon the above facts and medical opinions, the ALJ determined that Plaintiff had the RFC to perform sedentary work, but with some additional limitations due to her physical impairments (Tr. 28). The ALJ limited Plaintiff to performing sedentary jobs requiring only occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasionally engaging in left overhead reaching, frequently engaging in left handling, fingering, and feeling; and no concentrated exposure to extreme heat and cold (Tr. 28).

However, Plaintiff argues that the ALJ erred by finding that she maintained the RFC to perform a range of sedentary work in light of the severity of her medical impairments (Pl.'s Br. at 7-8). Plaintiff's complaint of error rests on the position that the ALJ did not properly weigh the evidence. The undersigned feels that the ALJ correctly evaluated the objective medical evidence and Plaintiff's subjective complaints in determining that she could perform sedentary work.

A claimant's RFC is the most she can do despite her limitations. 20 C.F.R. Sections 404.1545(a), 416.945(a). The RFC assessment is an administrative finding, not a medical opinion.

Social Security Ruling (SSR) 96-5p, 1996 WL 374183 (S.S.A. July 2, 1996). The assessment must be based upon all of the relevant evidence, including the medical records, medical source opinions, and the individual's subjective allegations and description of her own limitations. 20 C.F.R. Sections 404.1545(a), 416.945(a). The final responsibility for determining a claimant's RFC is reserved to the Commissioner. 20 C.F.R. Sections 404.1527(e), 416.927(e).

A claimant's subjective allegations of pain or other symptoms alone will not establish that she is disabled. 42 U.S.C. Section 423(d)(5)(A); 20 C.F.R. Sections 404.1529(a), 416.929(a). It is the ALJ's responsibility to determine the extent to which a claimant is accurately stating her degree of pain and level of disability. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525,531 (6th Cir. 1997). Because the ALJ is charged with observing a witness's demeanor, his findings on credibility must be accorded great weight and deference. *Id.*

In this case, the ALJ reviewed Plaintiff's medical history with regard to her heart and back impairments, and based his RFC assessment on the evidence in the record. As noted by the ALJ, Plaintiff's "treatment records fail to reveal the type of significant clinical and laboratory abnormalities one would expect if [she] were in fact disabled" (Tr. 29).

With respect to Plaintiff's alleged cardiac impairments, the ALJ acknowledged Plaintiff's history of coronary artery disease, but noted that her recent medical history did not show that she experienced any disabling impairments (Tr. 30). The ALJ determined that Plaintiff's June 2010 echocardiogram revealed only mild ventricular hypertrophy with normal systolic function and an ejection fraction of sixty-five percent, which had been unchanged since 2004 (Tr. 30, 524). A November 2010 x-ray of Plaintiff's chest revealed no acute disease, and an August 2011 echocardiogram revealed normal function in both ventricles, with an ejection fraction of sixty-five percent (Tr. 30, 911, 926-27).

12

Furthermore, the ALJ noted that physical examinations failed to substantiate Plaintiff's allegations as to the debilitating nature of her chest pain (Tr. 31). Plaintiff's exams repeatedly revealed normal results for cardiac health; she had a normal heart rate and rhythm without murmurs, rubs, or gallops; she had normal EKG results; her physician suspected her symptoms were related to her anemia; and her symptoms improved following her hysterectomy (Tr. 31, 360-63, 530, 615-17, 880-83, 909, 911).

In regard to Plaintiff's alleged back impairments, the ALJ reviewed Plaintiff's MRI findings from February and March 2011, and noted that the physical examinations failed to reveal any debilitating impairments (Tr. 30, 833). The ALJ also indicated that Plaintiff's back pain had been treated conservatively with medical and physical therapy for a period of eight weeks (Tr. 30, 644-45). In addition, although it was recommended that Plaintiff receive epidural injections to treat her pain, she refused treatment (Tr. 30, 930). The ALJ also noted that in March 2011, an examination revealed Plaintiff had normal strength in her bilateral lower extremities, she had no evidence of scoliosis or spasm, and her range of motion was only mildly decreased (Tr. 30, 833). While Plaintiff had some symptoms related to her back problems, they were not of the severity to cause disabling limitations (Tr. 29-30). Hence, the ALJ correctly considered the evidence of record when determining the RFC, which reflects Plaintiff's abilities.

Thereafter, Plaintiff next argues that the ALJ failed to evaluate properly Plaintiff's subjective complaints of pain (Pl.'s Br. at 10). The ALJ, however, considered Plaintiff's subjective complaints with the total record, and correctly found that the objective medical evidence did not substantiate her allegations of disabling pain.

When evaluating a claimant's credibility, the ALJ is required to ascertain whether she has a medically determinable impairment that could reasonably cause the symptoms alleged and then evaluate the intensity and persistence of the claimant's symptoms to determine whether they limit her

13

capacity to work. 20 C.F.R. Sections 404.1520(c),416,929(c). A claimant's own description of her impairment and symptoms, standing alone, is not enough to establish disability. 20 C.F.R. Sections 404.1528(a), 416.928(a). An ALJ must consider the extent to which a claimant's self-reported symptoms can "reasonably be accepted as consistent with the objective medical evidence, and other evidence." 20 C.F.R. Sections 404.1529(a), 4126.929(a). In addition to a claimant's subjective complaints of pain or other symptoms, "there must be medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. Sections 404.1529(a), 416.929(a); *see, also, Spicer v. Apfel,* 15 F.App'x 227, 234 (6th Cir. 2001).

When evaluating a claimant's testimony, the ALJ's credibility determinations are to be given great weight and deference by a reviewing court. *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 542 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 476 (6th Cir. 2003).

In this case, the ALJ found that Plaintiff's impairments could be expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible to the extent they were inconsistent with the RFC (Tr. 29). The ALJ reviewed Plaintiff's medical history, and found that her treatment notes, examination results, and laboratory findings did not support the type of significant impairments claimed by Plaintiff (Tr. 29-31). In addition, the ALJ found that Plaintiff's request for her doctor to confirm she was able to work in order to continue collecting unemployment benefits at the same time she was claimant not to be able to work in order to collect disability benefits, undermined her credibility (Tr. 31, 727). While Plaintiff argues that a person deemed "disabled" under the Social Security Regulations is not always incapable of performing "some work," the ALJ's determination indicates he found that Plaintiff's apparent untruthfulness affected her credibility (Tr. 31). Further, Plaintiff's disability conveniently arose when she was laid off from her employment, she repeatedly attempted to find secretarial work, and she

14

reported she could perform a "sitting" job (Tr. 61, 192, 212). In conclusion, the ALJ correctly assessed Plaintiff's credibility by comparing her subjective complaints with her treatment history and her own statements.

## VIII. CONCLUSION

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform a range of sedentary work, including her past relevant work as a claims process clerk, and, therefore, was not disabled. Hence, she is not entitled to DIB and SSI.

Dated: May 30, 2013            */s/George J. Limbert*
                                        GEORGE J. LIMBERT
                                        UNITED STATES MAGISTRATE JUDGE